1

13UAMTBAps
1   UNITED STATES DISTRICT COURT
1   SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x
2
3   IN RE:  METHYL TERTIARY BUTYL          00 MDL 1358
3   ETHER ("MTBE") PRODUCTS                Master File C.A.
4   LIABILITY LITIGATION                   No. 1:00-1898 (SAS)
4
5   ------------------------------x
5
6                                          March 30, 2011
6                                          4:45 p.m.
7
7   Before:
8
8                   HON.  SHIRA A. SCHEINDLIN,
9
9                                          District Judge
10
10                      APPEARANCES
11
11  MILLER, AXLINE & SAWYER
12       Attorneys for Plaintiffs
12  BY:  MICHAEL D. AXLINE, ESQ.
13
13  COHN LIFLAND PEARLMAN
14  HERRMANN & KNOPF LLP
14       Attorneys for New Jersey Plaintiffs
15  BY:  LEONARD Z. KAUFMANN, ESQ.
15
16  WEITZ & LUXENBERG, P.C.
16       Plaintiffs' Liaison Counsel
17  BY:  WILLIAM A. WALSH, ESQ.
17
18  McDERMOTT, WILL & EMERY
18       Attorneys for Defendants Exxon Mobil Corp.
19       and Defendants' Liaison Counsel
19  BY:  STEPHEN J. RICCARDULLI, ESQ.
20       JAMES A. PARDO, ESQ.
21  EIMER STAHL KLEVORN & SOLBERG, LLP
21       Attorneys for Defendant Citgo Refining
22       and Chemicals Company, L.P.
22  BY:  NATHAN P. EIMER, ESQ.
23
23
24  BEVERIDGE & DIAMOND, P.C.
24       Attorneys for Defendant Sunoco, Inc. (R&M)
25  BY:  JOHN S. GUTTMANN, ESQ.
25

2

```
    13UAMTBAps
 1                        APPEARANCES (Cont'd)
 2  WALLACE KING DOMIKE & REISKIN, PLLC
 2       Attorneys for Defendants Shell Oil Co.,
 3       Texaco Refining and Marketing, Inc.,
 3       Chevron U.S.A. Inc., Motiva Enterprises,
 4       and Equilon Enterprises, LLC
 4  BY:  RICHARD E. WALLACE, JR., ESQ.
 5
 5  KING & SPALDING LLP
 6       Attorneys for Defendant Chevron
 6  BY:  CHARLES CORRELL, ESQ.
 7
 7
 8  Also Present: Kenneth E. Warner
 8                Special Master
 9
10
11            (In open court)
12            THE COURT:  Good afternoon, Mr. Walsh.
13            MR. WALSH:  Good afternoon, your Honor.
14            THE COURT:  Good afternoon, Mr. Axline.
15            MR. AXLINE:  Good afternoon, your Honor.
16            THE COURT:  Good afternoon, Mr. Kaufmann.
17            MR. KAUFMANN:  Good afternoon, your Honor.
18            THE COURT:  Good afternoon, Mr. Pardo.
19            MR. PARDO:  Good afternoon, your Honor.
20            THE COURT:  Good afternoon, Mr. Riccardulli.
21            MR. RICCARDULLI:  Good afternoon.
22            THE COURT:  Mr. Eimer.
23            MR. EIMER:  Good afternoon, Judge.
24            THE COURT:  Mr. Guttmann.
25            MR. GUTTMANN:  Yes, your Honor.  Good afternoon.
                 SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```

3

13UAMTBAps

```
 1                 THE COURT:  And Mr. Wallace.
 2                 MR. WALLACE:  Good afternoon, your Honor.
 3                 THE COURT:  And everybody else.  Are you all here on
 4    MTBE?  Yes?  I thought we had a really, really tiny agenda.  It
 5    just concerns the New Jersey case and the Puerto Rico case.
 6    All of you are interested in New Jersey and Puerto Rico?  I
 7    mean, I could understand the interest in Puerto Rico as a
 8    general matter, but New Jersey?
 9                 All right.  But we start with New Jersey anyway.
10                 So we have competing notions of what the case
11    management scheduling order should look like.  And there are
12    some very specific disputes in addition to dates themselves.
13    Plaintiffs think there should be some limits on the use of
14    interrogatories and propose no more than 90 for each side on
15    non-site-specific subjects and no more than 40 per trial site
16    from subjects that are site-specific, and that's without any
17    subpart.
18                 Plaintiffs also propose the parties should have 90
19    days to respond to those interrogatories and that they should
20    be served no later than 90 days prior to proposed fact
21    discovery cutoff, which it so happens that plaintiffs propose
22    be February 29.
23                 They also propose that defendants be precluded from
24    taking more than five depositions of New Jersey DEP personnel
25    per month, and that in turn plaintiffs will be barred from
```

13UAMTBAps
1   taking more than five depositions of any particular defendant's
2   personnel in one month.
3          Finally, they propose that deposition notices should
4   be served at least 30 days in advance of any proposed
5   deposition date.
6          The basis, or one of the reasons for wanting all these
7   limitations, plaintiffs say, is what occurred just before the
8   cutoff with site selection in February, when over 20 Jersey DEP
9   personnel were taken in 30 days, which puts a strain on the
10  agency.  And by structuring the case management order in the
11  way that I just described, plaintiffs think that that will
12  encourage the parties to stagger the depositions throughout the
13  fact discovery time period rather than waiting until the end,
14  where the lawyers will have to do everything at the last
15  minute.
16         And they also say that the proposed limitation on the
17  interrogatories is wise because the defendants have already
18  served over 80 non-site-specific interrogatories and what they
19  describe as extensive site-specific interrogatories for each of
20  the 36 discovery sites.
21         The defendant's view in a nutshell of all of that is,
22  we don't need all those limitations, we have a special master
23  available to resolve discovery disputes, including objections
24  based on burdensomeness or abuse of discovery, and there
25  haven't been such limitations before.

5

13UAMTBAps

1        To give you the short answer, I have to say, I think
2   plaintiffs are entirely right to think limitations are a good
3   thing.  I think interrogatories in general are useless, second
4   only to the pretrial order in the case, which is even more
5   useless, but interrogatories are not particularly useful.
6   Lawyers structure their answers forever and they're not
7   terribly effective devices to have this kind of number of them
8   and no limit and subparts going on and on.  And all this coming
9   at the end of interrogatories and depositions just leads to
10  endless requests for extensions of whatever cutoffs I set.
11       I've been down that road before for, I guess, 20 years
12  now.  And I know it just goes on forever.  And I think good
13  case management, if I were teaching judges, I would say good
14  case management technique is, the more specific, the sort of
15  stricter, the better; the more the Court sets in terms of
16  limits, the better.  I've been told that trial lawyers love
17  time limits at trial, something I don't do but other judges say
18  is great, and the lawyers love it.  So the more limits the
19  better.  I think I'm coming around to that point of view.
20       So I don't see any reason why I shouldn't accept, not
21  those particular numbers necessarily, but limits are right,
22  limits are good.  And the federal rules agree too.  The federal
23  rules go around limiting the number of hours per dep, the
24  number of deps per side.  It's all good.
25       What are you going to say, Mr. Riccardulli?  I've
                SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

6

13UAMTBAps
1   already told you how good it is to have limits.
2           MR. RICCARDULLI:  Your Honor, a couple things.  I'll
3   address the limit on the interrogatories separately from the
4   deposition issue, although they are, at least in this case,
5   related, in that last year in March we served, defendants
6   served, a set of interrogatories on non-site-specific issues.
7           THE COURT:  I'm told, yes, that's the whole point, I'm
8   told there were 80 of them.
9           MR. RICCARDULLI:  Right.  To date the plaintiffs have
10  not completed their responses to those 80.  We have, for
11  example, while they were ordered in October to supplement half
12  of those with -- and then the guidance is supplement the
13  remainder of them, we still have not received that second
14  supplementation for the interrogatories that Special Master
15  Warner didn't address.
16          Additionally, during that hearing, the plaintiff
17  committed to producing electronic discovery relating to the
18  ESI -- or, I'm sorry, to the non--
19          THE COURT:  Let me do one thing at a time.  The
20  supplementation of the second set that you said that weren't
21  addressed by the special master, when was the cutoff for doing
22  that?
23          MR. RICCARDULLI:  There was no deadline.
24          THE COURT:  You see?  That was my failure.  The more
25  case management the better.  Had there been a deadline, had it
                        SOUTHERN DISTRICT REPORTERS, P.C.
                               (212) 805-0300

13UAMTBAps

1   not been met, I would have expected you to complain the next
2   week, and I would have had them in and really pushed on that
3   and really got it done.  But I didn't hear from you until March
4   30, which is almost April 1.  What can I do if I don't know
5   about it?  So it's a failure of case management.  There should
6   have been an order, this is due on a certain date, if it's not
7   done, the other side complains or asks for some kind of
8   preclusion, asks for a remedy.  But there's no date, there's no
9   preclusion, there's no complaining.  That's my failing.
10            MR. RICCARDULLI:  But, your Honor, there's a reason
11  for why there was no deadline at that point.  At that point in
12  time, in October, we were switching gears at that point from
13  non-site-specific discovery to damage and focus-site discovery.
14            THE COURT:  Right.
15            MR. RICCARDULLI:  In dealing with plaintiffs, we were
16  told, look, we're going to wait to go supplement that second
17  set until after we get through these next couple of deadlines.
18  But now we're past that deadline and we don't have that yet.
19            THE COURT:  OK.  So what do you want me to do?  Set a
20  date?
21            MR. RICCARDULLI:  Yes.  I think that would be --
22            THE COURT:  Exactly.  That's why I think there should
23  be limitations on interrogatories, depositions, dates set and
24  everything, because I'm in full agreement with you that I
25  should set a date.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8

13UAMTBAps

1          MR. RICCARDULLI:  I guess, then, until we get the
2     responses or the supplements and then the corresponding
3     documents, it's hard for to us agree on the number as to what
4     the next number -- what the limit should be on what we may want
5     to follow up with at this time.
6          THE COURT:  Yes.  But these numbers proposed that you
7     opposed are already too high.  And then 90 for each side on 90
8     site-specific subjects?  That sounds extraordinary to me.  And
9     no more than 40 per trial sites on subject-specific sites -- I
10    don't know if that meant 40 for each side that you're
11    proposing.  I assume it did.  That's reasonable, 40 per side
12    per trial site on site-specific information.
13          And on the non-site-specific, I can't imagine why each
14    side needs 90 more, when there were 80 out there to which there
15    aren't complete answers yet.  It may be when you see complete
16    answers you wouldn't even need 90 more.  They're not very
17    useful anyway.
18          MR. RICCARDULLI:  And I think that's where we're
19    struggling here.  But in terms of the breadth of
20    non-site-specific discovery, this is the first case in New
21    Jersey to go forward.  We don't have the benefit of the prior
22    discovery we took in New York where -- the reason we did it
23    there, you know, that was common to two plaintiffs, Suffolk
24    County, the County of Suffolk City, New York.  Here, this is
25    really the first time we're taking -- and, again, this is
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

13UAMTBAps

1  statewide discovery against the plaintiff here.  This is not
2  limited to certain sites.  So 90 on early knowledge, treatment
3  of other chemicals, treatment of, you know, the operations of
4  the different agencies.  I know it sounds like a lot, but --
5          THE COURT:  In a way it doesn't, because, being that
6  it's non-site-specific means to me it's not larger in a way
7  than any single-plaintiff, single-defendant case.  You know
8  what I mean.  It's a single party, still in New Jersey.  And so
9  when the State of New Jersey knew something is when they knew
10 it.  There's not a hundred answers for that.
11         MR. RICCARDULLI:  And the other thing is, this is the
12 first time we got their regulatory agent/or their regulatory
13 body as the plaintiff.  So there are differences between the
14 way one branch, for example, the Office of Site Remediation,
15 responds to MTBE contamination, and then for purposes here --
16 which, again, this is the first case where there are natural
17 resource damages alleged.  Those are handled by a different
18 branch or department within the Department of Environmental
19 Protection.  So we've also got to explore the differences
20 between the way the two different departments, within the same
21 agency, have responded to MTBE contamination or other
22 contamination for purposes of calculating natural resource
23 damages and also cleaning up sites.  So there is this extra
24 layer here that wasn't --
25         THE COURT:  Let's not cross over back again between

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13UAMTBAps
1   non-site-specific and site-specific.  When you start to talk
2   about cleaning up sites, it begins to sound site-specific.
3          MR. RICCARDULLI:  The example I can give, though,
4   where it's not site-specific would be for the Office of Site
5   Remediation, that one department, how, to what level do they
6   clean up?  Is it the MCL across the state?  What are the
7   decisions they make, versus then, you know, responding by the
8   Office of Natural Resources.  What level do they take or what
9   are their views on the MCL?  So it is non-site-specific in that
10  it's not addressed as to what was done --
11         THE COURT:  Fair enough.  But interrogatories are not
12  the only discovery device.  Lawyers propound document requests.
13  Lawyers take depositions.  At the end of the day lawyers want
14  requests to admit.  So we do this four different ways.  We get
15  asked the same question four different ways.  I generally find
16  interrogatories are the least useful.  Requests to admit are
17  probably the second least useful.  Not a whole lot of
18  controversy about that.  But to have no limits and no dates and
19  no structure does not seem like a good idea.
20         What's wrong about the suggestion about not taking
21  more than five deps of New Jersey DEP personnel per month?
22  Because it is hard to take 20 within 30 days.
23         MR. RICCARDULLI:  Yes.  During the meet-and-confer
24  process, you know, we had said -- we understand there's some
25  limit.  We understand the strain, on, frankly, all parties, in

13UAMTBAps
1    terms of trying to really schedule.  There was a reason why we
2    did it.  We had to squeeze it in between the time the e-mails
3    were produced and when the cutoff was.
4              THE COURT:  I understand that.  That's the history.
5    But what's the problem with this kind of a limitation going
6    forward?
7              MR. RICCARDULLI:  Well, going forward, it's sort of an
8    artificial cap on one number.
9              THE COURT:  Any number is artificial.  Seven?  Nine?
10             MR. PARDO:  But if it's five among ten, we won't find
11   out within months with a cap on what we need.  But we tried to
12   start depositions last year.  In June we served ten depositions
13   notices, but the document production wasn't needed.
14             THE COURT:  I understand.
15             MR. RICCARDULLI:  So we were told you can start them,
16   but you have to understand if you know you don't have the
17   documents, you can't call the witness back later when I then
18   find and complete that document production.
19             So while we tried to start last year -- and we were
20   very clear a year ago, I remember standing up and saying we
21   have non-site-specific discovery and we're going to get started
22   right away, and now a year's gone by almost, or ten months.
23             THE COURT:  And you have.  20.  Because you had them
24   in the 30 days prior to site selection.
25             MR. RICCARDULLI:  Well, those were for site-specific
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13UAMTBAps
```
 1  depositions, and for ten of those case managers, those sites
 2  are no longer in the case.  So going forward, where we did take
 3  the deposition on limited issues as to what we needed to know
 4  to pick sites, those ten depositions are now irrelevant,
 5  frankly, going forward.
 6          THE COURT:  Correct.  But ten more.
 7          MR. RICCARDULLI:  Well, eight weren't for our -- we
 8  took 17 so seven wouldn't stay in.  I've got to do the numbers
 9  here.  But that was for one person who worked at the site at
10  one given time.  Over the course of the time while these sites
11  have been open, they have been moved from one case manager,
12  then transferred to another, then to another.  We have yet to
13  determine whether or not we need to take depositions of the
14  other people who have worked on that site at given time
15  periods.  This site may have been in existence for 20 years.
16  The case manager we deposed, most likely the most recent or
17  current, may have been only associated in some of these
18  instances for a year or two.  So for 18 years for that site,
19  that case manager wasn't familiar with what had gone on
20  beforehand.
21          But the notices we served last June --
22          THE COURT:  On record?
23          MR. RICCARDULLI:  This wasn't a 30(b)(6).
24          THE COURT:  But it could be.
25          MR. RICCARDULLI:  It could be.
```

13UAMTBAps

1          THE COURT:  You could structure it that way, where one
2    person does review the records for those 18 years and is
3    prepared to testify throughout the period.  Because someone who
4    was the site manager 18 years ago probably is long since
5    retired.  You would have difficulty getting that person.
6    Anyway, even if you find them, they don't remember.  They would
7    have to review all the same documents anyhow that the 30(b)(6)
8    witness would.
9          So there has to be an efficient way to do this.  You
10   wouldn't take every single person who had managed that site.
11   As I already said, most of them are retired and most of them
12   won't remember.
13         MR. RICCARDULLI:  We frankly small organizations like
14   the Suffolk County Water Authority where scheduling deps would
15   be arguably a larger burden on them for the fewer employees.
16   This was never an issue in terms of us not being able to work
17   out a schedule.  You know, we tried to start ten months ago on
18   these depositions, haven't been able to do it.  And now, with
19   this limit, whether it's five or six --
20         THE COURT:  Or ten.
21         MR. RICCARDULLI:  Depending on what the ultimate
22   cutoff is, that may be a cap where we lost, now, ten months,
23   where we've tried to take depositions and have been frustrated
24   in doing that.
25         THE COURT:  Anyway, they proposed a fact discovery
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13UAMTBAps

```
 1  cutoff of essentially March 1.  So we're coming up to April
 2  1st.  That would be 11 months.
 3          MR. RICCARDULLI:  Right.  But we still don't have the
 4  documents in many instances or the e-mails, for example, to
 5  even start those depositions.  And if it's by next month, we
 6  don't have the documents yet to start those next months.
 7          THE COURT:  You don't have documents for even five?
 8          MR. RICCARDULLI:  Not come -- no e-mails whatsoever
 9  from any of the non-site-specific -- on the non-site-specific
10  topics.  We have hard copy files but no ESI.  No e-mails from
11  any of the covered persons, and we're still negotiating with
12  plaintiffs the test case on the hard drives that you ordered in
13  November.  We're still trying to negotiate the protocol.  That
14  process is underway.  So at this point we don't have any
15  assigned -- on the non-site-specific issues and limited from
16  one case manager per site for our ten, the ten trial sites that
17  we picked, but none of that from the ten trial sites that the
18  plaintiffs have identified for trial.
19          THE COURT:  Well, then it sounds like it's time to
20  hear from the plaintiff's attorney as to why you don't have
21  that, Mr. Axline.  And a commitment to when they will -- you
22  know, there comes a point, Mr. Axline, on pain of dismissal,
23  the case gets old.  If you don't want to move it, you don't
24  want to pour the resources in, then there shouldn't be a case.
25          MR. AXLINE:  I would like to address the ten
```

13UAMTBAps

1    non-site-specific depositions that Mr. Riccardulli keeps
2    referring to.  That's the focus of his discussions with you.
3              THE COURT:  The ten non-site-specific depositions?
4              MR. AXLINE:  Yes.
5              THE COURT:  I didn't hear that.  The last thing I was
6    interested in was why they don't have any ESI from the ten
7    sites that plaintiffs have selected.  Is that what you said,
8    Mr. Riccardulli?
9              MR. RICCARDULLI:  We don't have any for the ten sites
10   and we don't have any on the site-specific issues at all.
11             THE COURT:  That's right.  There were two topics.  He
12   said he has nobody assigned for anything non-specific and the
13   test sites plaintiff selected.  Why don't we stick with that,
14   Mr. Axline.
15             MR. AXLINE:  Well, I will stick with ESI and tell you
16   that when we went through the sort of fire drill with respect
17   to trial-site selection and the defendants asked, last fall,
18   for ESI, the defendants proposed a search strategy for us, that
19   they wanted us to run for e-mails.
20             THE COURT:  For what?  For -- E?  I missed word.
21             MR. KAUFMANN:  E-mails, e-mails.
22             MR. WALSH:  That the defendants wanted us to run for
23   e-mails.
24             THE COURT:  Yes.
25             MR. AXLINE:   There was some back-and-forth over that.

13UAMTBAps
```
 1   We didn't think it was a good search strategy but we ultimately
 2   acceded to the defendants' request.  We ran the search.  It was
 3   a disaster.  It produced far more documents than I think
 4   anybody anticipated and most of them were irrelevant.  We then
 5   had to go back to the drawing board.
 6            Now, what Mr. Riccardulli doesn't say in his letter to
 7   you but what is actually going on is that the defendants are
 8   now asking us to help, to work with them to design a better
 9   search strategy for e-mails, both for the ten -- well, for the
10   non-site-specific electronic discovery, and for the electronic
11   discovery that is site-specific.  So they have asked us to help
12   them so we don't have that problem this time around.  And that
13   is the reason for any delays.  We have to come up with
14   defendants for the search strategy, for electronic information
15   that makes sense, and that hasn't happened yet through no fault
16   of the states.
17            THE COURT:  I'm sorry.  I really don't think I
18   understand.  I really don't.  You seem to fault them for
19   wanting to include you in the process of designing a search
20   protocol, but that's the best thing they could have invited,
21   because you said their search protocol was overbroad, produced
22   too much material, you didn't like it, it didn't work, so they
23   invited you to work with them.  Then you're sort of complaining
24   that it's not done.  If you want this done in a week, I'll just
25   appoint an expert in search techniques, neutral, of course, on
```

13UAMTBAps

1   both sides, who designs the protocol.  It will be done in a
2   week.  There are experts in this and they're generally not
3   lawyers, as you know.  There are new and fascinating methods of
4   doing searches and they're not old-fashioned like key words
5   anymore.  It's not the way people are doing it.
6         MR. RICCARDULLI:  I'm sorry.  We, in the
7   meet-and-confer on the hard drive, we actually made that
8   suggestion last week about trying to find a neutral who would
9   help us with this process, and that proposal was rejected.
10        THE COURT:  So you can't have it every which way,
11  Mr. Axline.  You're a plaintiff.  You're either going to move
12  this case forward or not.  Would you like to move your case
13  forward?
14        MR. AXLINE:  Absolutely your Honor.
15        THE COURT:  Then I'll give you somebody who can design
16  a search properly.  There are experts in this field.
17        MR. AXLINE:  We will be happy to do that.  I just need
18  to point out, I think, in fairness to your Honor, that we
19  didn't receive this request from the defendants until last
20  week.  So we thought it would be --
21        THE COURT:  They invited you to sit down with them,
22  apparently, and design the search together.
23        MR. AXLINE:  And we told them we would.
24        THE COURT:  You told them, but you haven't done it.
25        MR. AXLINE:  We received it last week.  We have

13UAMTBAps

1  start -- I think it's been scheduled already.
2           MR. KAUFMANN:  Judge, just to clarify, we had a
3  meet-and-confer exactly on the process.  We understand what
4  we're doing.  I would say it's likely that by Friday we will
5  have a resolution of how we're going to search.  And that
6  includes using specific key words --
7           THE COURT:  Yes, I thought you were going to say key
8  words.
9           MR. KAUFMANN:  But that was the defendant's proposal.
10          THE COURT:  It may have been a year ago.  It's out.
11 It's not the latest and best way to search.
12          MR. RICCARDULLI:  And, your Honor --
13          THE COURT:  There are much better means now.  The
14 field advances very quickly.
15          MR. KAUFMANN:  If they have a proposal other than
16 that, we're willing to work with them.  That was the proposal
17 that they want us to do.
18          THE COURT:  Of course they did.  That was a year ago.
19          MR. KAUFMANN:  And we said ago.
20          THE COURT:  This was a year ago.  No.  It was run.
21 Mr. Akron said it was run.  It was overinclusive, which, a lot
22 of those search terms produced overinclusive results and then
23 everybody gets stuff they don't want and it's costly to both
24 sides.  So it's not the way to go.  You need expert assistance,
25 it strikes me.  This is not something that lawyers understand.

13UAMTBAps

```
 1     I wish I understood it.  I'd be very wealthy.  But I don't
 2     understand it.  It's very technical.
 3              MR. AXLINE:  Both sides do have experts, your Honor.
 4     And we have now for the first time in this meeting that
 5     Mr. Kaufmann referred to --
 6              THE COURT:  Who are you using?
 7              MR. AXLINE:  These are non-disclosed litigation
 8     experts who we, for purposes of meeting with the defendants'
 9     experts, have agreed to allow to talk to each other.
10              THE COURT:  Each other.
11              MR. KAUFMANN:  They were on the phone during the
12     meet-and-confer much of the conversation.
13              THE COURT:  With your experts on designing searches?
14              MR. KAUFMANN:  Yes, your Honor.
15              THE COURT:  And they have talked to each other?
16              MR. KAUFMANN:  Yes, your Honor.
17              MR. AXLINE:  Just recently.
18              MR. KAUFMANN:  On Monday.
19              THE COURT:  Oh, on Monday.
20              MR. KAUFMANN:  On Monday we had the meet-and-confer on
21     this, and we each had our ESI experts on the search protocols.
22              THE COURT:  So they know who each other are but the
23     adversary's lawyers don't.  Is that it?
24              MR. KAUFMANN:  That's -- well --
25              MR. AXLINE:  The adversary lawyers do, but there was
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13UAMTBAps

1    an agreement that it's only for the purpose of trying to make
2    this work efficiently, the search.
3              THE COURT:  No, I understand, but Mr. Riccardulli does
4    know who your expert is and he knows who yours is?
5              MR. RICCARDULLI:  We know their first names only.
6              MR. KAUFMANN:  But luckily the first name is George
7    for each of them, so that makes it --
8              MR. RICCARDULLI:  Judge, they know who ours is.
9              THE COURT:  George I probably know.
10             MR. RICCARDULLI:  It's George.
11             THE COURT:  I know at least one of the Georges in this
12   field.  I don't know any other Georges.
13             MR. KAUFMANN:  Just the point I want to make, your
14   Honor, is that I think that we have gotten 90 percent of the
15   way and probably within the next day or two will have gotten a
16   hundred percent of the way to establishing the search protocol
17   the way the defendants want it.  If they want to talk of a
18   different way, we're certainly willing to do that, but I think
19   that we're almost there.
20             THE COURT:  No, wait.  If their own expert advises
21   them that the deal is struck, they should be satisfied.  It's
22   their expert.  If George says so, George must be right.  They
23   hired him.
24             MR. KAUFMANN:  There were some questions that we
25   needed explanations on as to what they wanted.  We got that.

                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

13UAMTBAps

1  We told them we would get back to them by the end of the week,
2  which we will.
3              THE COURT:  The end of the week is two days away now.
4              MR. KAUFMANN:  Yes.
5              THE COURT:  Much as I would love to barge in and do
6  something at some point, if your George is about to say, let's
7  go with it, why don't we wait a few more days.
8              MR. RICCARDULLI:  Your Honor, that's fine, but --
9              THE COURT:  Just days, but you can report back on
10 Monday the 4th.
11             MR. RICCARDULLI:  Yes.  But for the record, the
12 conversation and this meet-and-confer process where the
13 consultants have spoken is limited to the search for the ten
14 individuals and the ten hard drives, the sampling event that we
15 talked about that was ordered in November of last year.  You
16 ordered that, in terms of doing ESI as to hard drive
17 information, that we do ten sample runs, right, not -- opposed
18 to every covered person.
19             THE COURT:  But that would be site-specific.
20             MR. RICCARDULLI:  Ten individuals.  It's a mix.  It's
21 not necessarily.  This was for non-site-specific, but it was
22 for hard drives only.  We have yet to have a proposal from
23 plaintiffs in terms of when they're going to produce e-mails
24 for non-site-specific issues for the covered persons.  This is
25 limited.  The meet-and-confer is only as to --

13UAMTBAps

1          THE COURT:  You keep saying it's limited to the hard
2     drives.  But do you know if they're not on the hard drives?
3          MR. RICCARDULLI:  No, they're not.  They're in a
4     different -- by "hard drives" I mean if you were to save
5     locally an Excel file, a PowerPoint, locally to your desktop,
6     for example.  We're searching, we're doing this ten-individual
7     test case to see if it's worth the effort.
8          THE COURT:  And the e-mails are on a server?
9          MR. RICCARDULLI:  The e-mails are on a server.
10          THE COURT:  These experts know all about that too.
11     Why aren't they talking about it?
12          MR. KAUFMANN:  Your Honor, we're more than willing to
13     talk to them about it.  We did what they wanted the way they
14     wanted for the 18 discovery sites.  We finished that.  And we
15     had jointly decided, before we went into that process, that the
16     first step would be to do the 18 case managers.
17          THE COURT:  But on their e-mails?
18          MR. KAUFMANN:  We did.  We did those e-mails.
19          THE COURT:  No.
20          MR. RICCARDULLI:  For 18 people.
21          MR. KAUFMANN:  We did the e-mails for the 18 focused
22     site -- actually it was more than that because we did -- no,
23     no, it was 18, for those site-specific focus sites.  We did
24     those.  And that was the schedule that we agreed on.  And we
25     agreed that once we had done that, then we're going to move to

13UAMTBAps

1  these ten designated non-site-specific.  That's where we are
2  now.
3          We still have to do --
4          THE COURT:  But the e-mail search that you did do, did
5  it produce e-mails to the defendants?
6          MR. KAUFMANN:  Yes.
7          THE COURT:  Because they said they hadn't gotten it.
8  I thought, Mr. Riccardulli, you said you had not gotten any
9  e-mails.
10         MR. RICCARDULLI:  On non-site-specific issues, Judge.
11         THE COURT:  But if those people's e-mails were
12 searched, they didn't separate --
13         MR. RICCARDULLI:  They were searched specifically for
14 site-specific issues as to --
15         THE COURT:  It is all mixed together.  The
16 site-specific and non-site-specific search he said was all one.
17 Now you said the 18 people's e-mail does not search for the
18 non-site-specific information.  That the bizarre.
19         So are you ready to re-search?  I don't know why you
20 did it twice.  Are you ready to run a second search on the same
21 18 people through their e-mail again for the non-site-specific
22 information?  Because there has to be a test that shows whether
23 the search design is good or bad.
24         MR. KAUFMANN:  Right.  We are willing to do the search
25 of the e-mails for the site-specific personnel.  All we have to
                SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

13UAMTBAps
1    do is agree on what that protocol is going to be.  We haven't
2    had that discussion, and I think not through the fault of
3    anybody, but we haven't had it because the discussions have
4    progressed from, let's do this task first, let's do this task
5    second, and let's do this task next.  That's the way they want
6    it.  The e-mail search that we did, which was essentially the
7    search that the defendants wanted us to do, they admit was not
8    as effective as they had hoped.  Now, if they want to change it
9    for the next round of e-mail searches, we're willing to speak
10   with them and to do it in a way that will be effective.
11            MR. RICCARDULLI:  Your Honor, just one point.  We
12   proposed an e-mail search protocol for the case managers there
13   because when we said to plaintiffs, how are you going to
14   identify what is the protocol you're going to use, they said to
15   us, you propose the protocol on how I should search my e-mail
16   system.  And without a proposal from them, we did our best to
17   craft one.  Then, when it was overly burdensome or overly
18   inclusive, then we got criticized for drafting a protocol for a
19   system that we didn't control and for one that we didn't
20   implement.
21            THE COURT:  It does not sound like people are working
22   well together, it really doesn't, to me.  So it needs to
23   change.  We need to do a simplified meet-and-confer.  All that
24   needs to happen is these two experts need to be in a room with
25   one lawyer each -- it could be Mr. Riccardulli, it could be
                 SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

13UAMTBAps

1    Mr. Kaufmann -- one for each side, one George per side, and
2    Mr. Warner -- or and me, doesn't matter.  But five people in
3    the room.  Two lawyers, two experts, and one judge.  Five
4    people sit down and cover all of it.  No more, well, we only
5    did this, because they wanted to do this first, we didn't talk
6    about that, we meant to do this.  We'll never move this
7    forward.  This meeting of five people should take place in a
8    week.
9              MR. KAUFMANN:  That's fine.
10             THE COURT:  And it should cover all these ESI topics,
11   the site-specific, the non-site-specific.  It should cover
12   everything.  And I bet you in two hours you'll provide all the
13   protocols should be on their way to be designed.  The experts
14   say I've got the picture, I'll get back to you within 48 hours
15   with a plan.  Hopefully the other George agrees with my plan.
16             MR. KAUFMANN:  I don't have any problem with that.
17             THE COURT:  All right.  So Mr. Warner?  I guess.  It
18   doesn't matter.  There should be a supervisor, either me or
19   him.  He costs more, but he's probably better, you know.  So if
20   I were you --
21             MR. WARNER:  I'd take issue with that.
22             THE COURT:  So the five of you should sit down in a
23   room, seriously, and do it.  Just do it.  And my direction,
24   which is what I knew, was that it be all ESI searches.
25   Site-specific, non-site-specific, you know, the 18 case

13UAMTBAps

1   managers, the general people who have the non-site-specific
2   information.  And not just their hard drives but the servers,
3   all ESI.
4           MR. KAUFMANN:  Right.
5           THE COURT:  Let's be done with this.  I don't want to
6   hear this piecemeal effort again.  And you're welcome to report
7   back one week after that.  If we don't have a design after
8   then, I'm bringing in my neutral, who won't be named George.
9   Some other one.
10          MR. KAUFMANN:  So, your Honor, if I understand your
11  Honor correctly, we'll have a meet-and-confer to map out all
12  remaining ESI.
13          THE COURT:  All.
14          MR. KAUFMANN:  OK.
15          THE COURT:  That's right.  All kinds of ESI.  All
16  issues.
17          MR. KAUFMANN:  I just sort of as a caveat, we --
18          THE COURT:  And you could bring one more person.  So
19  it will be six people.  You can bring an inside IT person so
20  there can be some prediction of the time it will take, some
21  realistic prediction, so your prediction.  You don't need to
22  bring that person.  You need to bring your consultant, outside
23  consultant.  They can bring their outside consultant.  They can
24  also bring their in-house IT person to give some estimate of
25  what this all is going to take, in time.

27

13UAMTBAps

1           MR. KAUFMANN:  We do understand that they --
2           THE COURT:  I'm sorry, Mr. Riccardulli.  What?
3           MR. RICCARDULLI:  Just for defendants, it's just one
4   representative, and that might not necessarily be me.
5           THE COURT:  No, right.  I don't care which lawyer it
6   is.  I mean, you're likeable.  Hopefully whoever else they send
7   is equally likeable.
8           So one lawyer, one consultant, you get to bring an IT
9   person.
10          MR. RICCARDULLI:  OK.
11          MR. AXLINE:  Thank.
12          MR. KAUFMANN:  Thank you.  And the effort that we're
13  undertaking now is the ten non-site-specific individuals.
14          THE COURT:  No.  No.  It's everything.
15          MR. KAUFMANN:  No, no, no, I just wanted to point out
16  and reiterate --
17          THE COURT:  Oh.
18          MR. KAUFMANN:  It's not anything new.  But reiterating
19  that those ten people were a test to determine how burdensome
20  it was going to be to do the search.
21          THE COURT:  But the test doesn't count because it's
22  the wrong protocol.  It was a bad protocol.  It was
23  overinclusive.  It didn't include e-mail anyway.
24          MR. KAUFMANN:  I don't think so.  I think we're hoping
25  that the protocol that we're developing will in fact be

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13UAMTBAps
```
 1   effective for the non-site-specific.  And what it will tell us
 2   is how burdensome it is.  So this meting coming up is not going
 3   to say, you have to take that protocol and apply it
 4   automatically to the 1100 people that they want for
 5   non-site-specific.  As directed, we're going to see what the
 6   results of that are and then determine whether that's effective
 7   for 1100 people, whether they only want to do it for another 10
 8   or 100.
 9               THE COURT:  OK.
10               Now, so all of that said, I have to return to what you
11   were saying, Mr. Riccardulli.  So you don't have the ESI.  You
12   don't have -- you have any hard copy, a paper record, with
13   respect to the ten sites the plaintiffs selected?
14               MR. RICCARDULLI:  We have certain hard-copy documents.
15   I wouldn't say that the document production is completed.  But
16   there are some documents that we do have.
17               THE COURT:  On each of the 20 trial sites.
18               MR. RICCARDULLI:  On each of the 20 trial sites and on
19   some non-site-specific issues.
20               THE COURT:  OK.  So what's the situation with
21   beginning depositions?  You have 11 months until their proposed
22   deadline of March 1.
23               MR. RICCARDULLI:  We can certainly start, and frankly
24   we would like -- we tried to last year, but we weren't willing
25   to start if it was going to be, you get this witness once and
```

13UAMTBAps
1  you'd never seen see him again even though you know you're
2  starting him without complete document production.
3            THE COURT:  So is there anyplace you can start?
4            MR. RICCARDULLI:  Yes.  We have identified at least
5  some of the ten that we think we can get started on, and we
6  talked about it last week, that there are certain people.
7            THE COURT:  Have you served notices or done it by
8  meet-and-confers?
9            MR. RICCARDULLI:  We have not renoticed up those -- I
10 mean, we are still --
11           THE COURT:  Well, you shouldn't have to renotice for
12 them.  But you should be able to have a conversation with
13 Mr. Kaufmann or anybody on his team and say, if we really only
14 have 11 months, we are ready to take ten in the month of April,
15 which is ambitious, but we're ready to because of months with a
16 lot of holidays and whatever, but we're ready to do it in
17 April.
18           MR. RICCARDULLI:  I need to go back and look, but
19 we're prepared to start.  And on the scheduling issue, the 30
20 days in advance or whatever, we've been flexible.  Even in the
21 middle of February, on that tight schedule, we were
22 accommodating in terms of moving witnesses around.  There were
23 a lot of weather disruptions.  And we worked it out.  So we're
24 not opposed to -- we can do it now.
25           THE COURT:  We'll have bad weather until June, as far
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

30

13UAMTBAps
```
 1   as I can tell now.  But in any event I really don't think you
 2   need 30 days in a cooperative effort.  I would have thought 21
 3   days is enough in terms of fair notice, and then everything
 4   else you should be able to cooperate on, if you could do no
 5   more than ten a month.  That's 11.  That's a lot people.
 6              MR. RICCARDULLI:  It is a lot of people.
 7              THE COURT:  Right.  So if you did no more than ten a
 8   month at the agency, you get 21 days' notice.  It's a
 9   negotiated problem.  And turn to Special Master Warner to
10   resolve intractable, intractable problems, which they shouldn't
11   be, anybody.  Cooperate.  But occasionally there are.  Maybe it
12   should flow.
13              MR. RICCARDULLI:  Understood.
14              THE COURT:  So then we're left with this limitation on
15   interrogatories where we started.  I really think there should
16   be a presumptive limit, as there is in the federal rules, of 50
17   for each side on non-specific subjects and 40 per trial site
18   per side, specific to each site.  And that's enough.  That's
19   enough.  And after that you have a burden to show why you
20   should be entitled to more.  So it's not an absolute cutoff
21   without remedy.  But it's a presumptive limit.  The burden
22   would be on the party seeking order to show good cause.
23              MR. RICCARDULLI:  And just for point of clarification,
24   your Honor, we had already served whatever the number is.
25              THE COURT:  They say 80.
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13UAMTBAps
```
 1                 MR. RICCARDULLI:  50 more or --
 2                 THE COURT:  No, no, no, not 50 more.  50 more on
 3     non-site-specific, 40 per side on site specific.  And that's
 4     it.  So there are limits.
 5                 We talked about ten.  No more than ten per month.
 6     Reciprocal ten.  The notices will be 20, one day in advance.
 7     And that solves the first problem on the agenda.
 8                 MR. AXLINE:  Your Honor, just with respect to the
 9     number of interrogatories, the defendants' interrogatories
10     included multiple, multiple subparts.
11                 THE COURT:  80?
12                 MR. AXLINE:  80 interrogatories, right.  And now
13     they're going to serve an additional 50.
14                 THE COURT:  With no subparts.
15                 MR. AXLINE:  With no subparts.  All right.  Thank you.
16                 MR. RICCARDULLI:  Your Honor, I'm sorry.  I don't know
17     if I heard you correctly.  When, for focused sites is it --
18     whatever the limit you said, I think you said 40 per site, or
19     did you say side?
20                 THE COURT:  Per site per side.
21                 MR. RICCARDULLI:  Per site, OK.
22                 THE COURT:  Per site per side.
23                 MR. RICCARDULLI:  Thank you.
24                 THE COURT:  OK.  So that's is the first issue on the
25     agenda.  The next one, the trial site problem, is all the
```

13UAMTBAps
1    receptors.  Defendants say they're taking discovery on a moving
2    target because they can't get a definitive answer on the number
3    of receptor wells allegedly impacted by the selected trial
4    site.  They are all released by site like a gas station.  And
5    defendants are asking that the CMO include a deadline by which
6    plaintiffs must confirm -- this is a word not terribly familiar
7    to me -- but their delineation for all trial sites.  And maybe
8    that's one of the problems, is defining that word
9    "delineation."  But the background is that these designated
10   release sites implicate many receptor sites.  So plaintiffs
11   were required to identify the specific number of wells
12   potentially affected by these releases.  And after a deadline
13   was set, plaintiff's disclosures identified 67 community public
14   water supply well receptors, 27 non-community receptors, and
15   362 private well receptors.  And defendants say that's an
16   unmanageable amount of discovery and that the Court had said it
17   would revisit this after trial selection.
18           Now, defendants say that, with the plaintiff's ten
19   trial sites that plaintiffs have already selected, that
20   implicates a total of 348 receptor wells, including 45
21   community public water supply wells, 13 non-community wells,
22   and 290 private wells.  Again, it should be an extraordinarily
23   amount of discovery if one had to go site by site.
24           Plaintiffs say it isn't as large as it sounds.  It
25   says first of all there's no reason that the receptors can't be

13UAMTBAps

1    grouped.  For example, the private wells are really clustered
2    in one area.  So any other source of contamination is the same.
3    I mean, if they're clustered together, if there's an
4    alternative source of contamination, it's true for all those in
5    the cluster, if they're close enough.  They say it really only
6    implicates six community public water systems for all of ten
7    plaintiffs' trial sites.  And that wouldn't be so very hard to
8    discover, if you're talking about six water systems.  But
9    apparently these water providers draw from dispersed water
10   production wells, and they only have to measure at the
11   treatment facility that comes from the well, not at the wells
12   themselves.  But plaintiff says they don't know that at least
13   one well is sending the contamination to the treatment facility
14   if they don't know which well.
15            So everybody's saying there's a lot more discovery, I
16   guess, than it would take to bring these things down.  And I
17   really have to turn to the plaintiffs to say, how can we make
18   what sounds sprawling and limitless something that has
19   limitations.  How can we do it and be fair, for those numbers
20   that sound so big?
21            MR. AXLINE:  Well, first let me say, your Honor, that
22   we have offered to cooperate with the defendants in getting
23   this narrowed as quickly as possible.  It is a difficult task.
24   One of the things that we suggested, for example, was that we
25   jointly contact the water treatment systems to see if they can

13UAMTBAps

1   tell us which of the wells that they're drawing from has MTBE.
2   That would help narrow it down.
3          THE COURT:  That would be essentially third-party
4   discovery from the lawyers.
5          MR. AXLINE:  Correct.
6          THE COURT:  That's a good idea.  Anything wrong with
7   that, Mr. Riccardulli?
8          MR. RICCARDULLI:  It's not, your Honor.  But it's
9   not --
10          THE COURT:  It's not what?
11          MR. RICCARDULLI:  It's not going to fix the problem.
12          THE COURT:  Is it a step in the right direction?
13   Because if they can identify the source, which well essentially
14   is contaminated, they have that.
15          MR. RICCARDULLI:  It's a step in the right direction.
16          THE COURT:  OK.  So why don't we agree right away to
17   do that.  What would it be?  A joint subpoena or a joint notice
18   for a deposition, a Rule 45?  What would it be?  How would you
19   do it?
20          MR. AXLINE:  Frankly, your Honor, I think we should
21   first try to do it informally.  It's always faster if you can
22   accomplish it in that way.  And if not, then it would a joint
23   subpoena.
24          THE COURT:  OK.  So how would you suggest going about
25   it informally?

13UAMTBAps

```
 1              MR. AXLINE:  We already have the numbers for most of
 2      these water suppliers.
 3              THE COURT:  What do you mean, number?  Old-fashioned
 4      telephone number, you mean?
 5              MR. AXLINE:  Absolutely.  Call them up.  Call them up.
 6      There's going to be one guy who's going to know.  And ask them.
 7              THE COURT:  So how do you propose to do that?  You're
 8      going to make a conference with Mr. Riccardulli on the line,
 9      dial the number, and he won't be there, and leave a message.
10      It sounds like another world.  Do you happen to have an e-mail
11      address?
12              MR. AXLINE:  I didn't know, but I'm sure we could
13      obtain one.
14              THE COURT:  Well now, that is better than a telephone
15      because you don't leave messages and people return calls and
16      you're not together and therefore it's not a conference.  Why
17      don't you find e-mail address for the appropriate people.  The
18      six lawyers reply.  Write a joint e-mail, ask them to hit reply
19      to all, and tell them what you're looking for.
20              MR. AXLINE:  That sounds like a good idea.
21              THE COURT:  It does.
22              MR. RICCARDULLI:  Your Honor, that's fine for an
23      initial step.
24              THE COURT:  It is.
25              MR. RICCARDULLI:  But in -- of course you'll hear
```

13UAMTBAps

1   about it later, but these third parties may not be all that
2   willing to start turning over all this --
3           THE COURT:  You don't know that.  You'll try, and if
4   they're not so willing to do it in response to an e-mail
5   request in the State of New Jersey together with the defendant,
6   you'll use my name.  "The Court has asked to us do this."  You
7   can try to throw that in.  If they're not willing, there is
8   such a thing as a Rule 45 subpoena.
9           MR. RICCARDULLI:  Right.
10          THE COURT:  OK.  Which you'll serve.  But any ruling
11  on that probably is New Jersey.  If there is any dispute, if
12  they move to quash that, I think that is not heard here.
13          MR. AXLINE:  I think it would end up coming here.  I
14  think it's issued in New Jersey.
15          THE COURT:  Because it is issued in New Jersey.  But
16  maybe because it's MDL it comes back.  We had that issue once.
17  I forgot which case.  Maybe it was a City of New York.
18          MR. AXLINE:  It was the Crescenta Valley Water
19  District case.
20          THE COURT:  Anyway, we had that issue.
21          MR. RICCARDULLI:  United Water, your Honor, as well.
22  That would be Jersey.
23          THE COURT:  Anyway we've had the issue.  But the
24  bottom line is, move quickly.  Start getting -- collect the
25  e-mail addresses within days.  Author a joint e-mail.  Ask the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13UAMTBAps

```
 1   person to hit reply to all.  Either they're going to cooperate
 2   or not.  You can say the Court is requesting it.  You can say
 3   the alternative is a Rule 45 subpoena, which you'll be happy to
 4   issue if they prefer it that way.  Move this right along
 5   without too much lawyer talk.  Just do it.
 6              MR. AXLINE:  Then the other thing that the state --
 7              THE COURT:  In fact I think, Mr. Riccardulli, you
 8   should appoint which person in your team is the point person
 9   for this effort, for contacting the water providers.  And
10   Mr. Axline will do the same.  And those two will be ready to go
11   with this project starting, you know, tomorrow, Friday, or
12   Monday.
13              MR. RICCARDULLI:  OK.
14              THE COURT:  Do you know who that person is right now?
15              MR. RICCARDULLI:  Not right now.
16              THE COURT:  But you'll let Mr. Axline know?
17              MR. RICCARDULLI:  I will.
18              THE COURT:  By when?
19              MR. RICCARDULLI:  Friday?
20              THE COURT:  Fine.  Mr. Axline, have your point person
21   chosen by then.
22              MR. AXLINE:  Yes, your Honor.
23              THE COURT:  Might be you.
24              MR. AXLINE:  No, it will not, your Honor.
25              THE COURT:  I really didn't think it was.  I thought I
```

38

13UAMTBAps
 1    would just throw that out.
 2              MR. AXLINE:  But thank you for thinking of me.
 3              The next thing that the state has offered to do, your
 4    Honor, in fact, is voluntarily engaged in right now, because it
 5    doesn't require the defendants' participation, is going back
 6    and looking at the cuts that we made in a compressed time frame
 7    when we were looking at the 18 focus sites, to attempt to see
 8    if we can, using litigation consultants rather than experts,
 9    further trim the receptors that are likely to be impacted or
10    possibly going to be impacted by the releases that we have
11    selected.  So we're engaged in that process.  I don't think
12    it's going to take us too much longer.  I can't say whether
13    it's going to reduce the number of receptors or not, but I can
14    tell you that we're engaged in it.
15              THE COURT:  All right.  Let's assume it doesn't and we
16    still have, I think, the last set of numbers was in the sample.
17    Let's say we still have 45 community public water supplies, 13
18    non-community, and 290 private wells.  Your fallback argument
19    is this clustering argument anyway, isn't it?
20              MR. AXLINE:  It is, your Honor.  And if I can address
21    that for a minute.  These receptors are not as complicated as
22    they might be in some other cases.  For example, you don't have
23    a hundred homeowners, each of whom have to give testimony on
24    the impact of their real estate value from MTBE contamination.
25    It is the state that is seeking its damages that relate to
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

39
13UAMTBAps

1   those clustered set of homes.  So it's not as complicated as
2   you might otherwise think to conduct discovery for those homes.
3   And --
4            THE COURT:  I don't think they were thinking of,
5   necessarily, damages as much as alternative sources of the
6   contamination.  They want to be sure to put the problem on
7   somebody else if humanly possible, which is understandable
8   given what they do for a living.  So they are looking for
9   somebody else to blame.  They have a right to do that.
10           MR. AXLINE:  Well, if that's the concerns, then the
11  cluster should pose no problem.
12           THE COURT:  That's what I was thinking.  No, that's
13  what I was thinking, quite seriously, that if there are
14  clusters placed together and there is an alternative source
15  down the road, they should be able to identify that source for
16  the whole cluster.
17           MR. RICCARDULLI:  Your Honor, it's a combination of
18  both.  It certainly is the other source information.  I know
19  that's the one we gave, the example we gave in our Sandoval
20  letter, but, for example, with the NRD claim, the natural
21  resource damage claim, one of the elements of that claim is
22  because of the presence of MTBE, there has been a loss of use
23  of the resource.  So that water wasn't able to be used because
24  of the presence of MTBE.
25           THE COURT:  Who had that claim, Mr. Axline?
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

40

13UAMTBAps
```
 1                MR. AXLINE:  I'm sorry?
 2           THE COURT:  Who had that claim, the loss of resources?
 3                MR. AXLINE:  The state.
 4           THE COURT:  The state.
 5                MR. RICCARDULLI:  Except if they're going to use the
 6    impact on the individual's homes --
 7           THE COURT:  As the measure?
 8                MR. RICCARDULLI:  As the measure.  -- it's important
 9    to know whether or not the homeowner actually experienced a
10    loss of use, if they continued to --
11           THE COURT:  I don't know that they are.  What do you
12    mean by "loss of use of the resource from the state's
13    perspective?"  You're not worried about whether the homeowner
14    had to buy bottled water.
15                MR. AXLINE:  No.
16           THE COURT:  What does the loss of use of the resource
17    mean to the state?  From a damage perspective.
18                MR. AXLINE:  This is a specific type of remedy, your
19    Honor, that's available to the state only.
20           THE COURT:  I know.  Tell me about it.
21                MR. AXLINE:  It allows the state to recover for the
22    lost use of resources that don't necessarily have an economic
23    value.  The best --
24           THE COURT:  Wait, wait, wait.  Would you repeat that,
25    please, if you could.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13UAMTBAps

1          MR. AXLINE:  Yes.  It allows the state to recover
2   lost-use damages for resources that don't have a ready market
3   by which to evaluate the damages.  And to give you the best
4   example I can, if a flock of birds land in a lake that's been
5   polluted and they all die because of the contamination, that's
6   a loss to the state of a public resource.
7          THE COURT:  It is?  What is the loss to the state?
8   Not the loss of the birds.
9          MR. AXLINE:  Yes, it is, yes.
10          THE COURT:  The state wants the birds?  Why?  They
11   just fly into airplanes.
12          MR. AXLINE:  They're a public resource, your Honor.
13          THE COURT:  They're a public -- the birds?
14          MR. AXLINE:  Yes.
15          THE COURT:  Who do they do for the state?
16          MR. AXLINE:  They provide -- they provide aesthetic
17   value.  They provide -- this is --
18          THE COURT:  You must be kidding.
19          MR. AXLINE:  No.  I'm not, your Honor.  And I know the
20   defendants are enjoying this, but --
21          THE COURT:  Well, they should be.  I think the jury
22   will take my view.  I don't understand why these birds are --
23   they're a public menace a lot of times.  I don't know why they
24   fly into airplanes and do other damages.  I don't know why
25   they're a public resource.  That's very bizarre.  Maybe you can

42

13UAMTBAps
```
 1   give me an example that I find less bizarre.
 2              MR. AXLINE:  Well, that's the best example I can --
 3              THE COURT:  No.  Birds are a public resource.
 4              MR. RICCARDULLI:  Your Honor, the example here is
 5   groundwater.
 6              THE COURT:  That is a public resource, yes.
 7              MR. RICCARDULLI:  And even the bird example, one of
 8   the evidence that the state will put on in the -- if there's a
 9   damage to a bird, for example, there are oftentimes surveys of
10   residents of the state and say, if it would -- if we could
11   spend X amount of money to save those birds and it was going to
12   be 10 dollars on to your tax bill at the end of the year, would
13   you do it?  Yes or no.  Well, would it be $5?  $2?  What would
14   be the cost to you or how do you value the loss of these birds
15   to the state?  And that's one of the things, that is, what the
16   people of the state value.
17              THE COURT:  What they say or what they would be
18   willing to fork over if made to pay.
19              MR. RICCARDULLI:  What would they be made to pay?  No
20   money?  $10?  How much would you pay if we do save all the --
21              THE COURT:  I know, but it's one thing to say it, it's
22   another thing to pay it.
23              MR. RICCARDULLI:  Your Honor, no, it's to say it.
24              THE COURT:  I don't think they would pay a penny to
25   save a bird.  They might want the money for their schools.
```
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

43

13UAMTBAps

1           MR. RICCARDULLI:  But to say to the jury we suffered a
2    loss because there's impact to the wells on Maple Street, but
3    everybody on Maple Street is continuing to drink the water and
4    it's never stopped --
5           THE COURT:  Well, it's always amenable to motion
6    practice.  I wouldn't mind getting the bird motion myself.  I'm
7    serious.  The thought of that being a loss of public resources
8    is really kind of upsetting, when we don't have money for
9    schools.  I really don't think anybody is going to raise their
10   taxes to save the birds.  There must be one person out there
11   who would, but basically, no.
12          This is not advancing the conversation, however.  We
13   need to go back to advance the conversation, which has to do
14   with, when I said loss of public resources, to whom.  I said
15   not the homeowner buying bottled water.  That's what you don't
16   mean.  That's the loss to homeowner.  What's the loss of
17   resources to the state.  It's not the birds.  I really
18   appreciate it, if I could feel the pain of the state.  But I
19   can't feel it with the birds.
20          MR. AXLINE:  To make it specific, for an area where a
21   public water provider is drawing water from an aquifer and they
22   can't do that, they can't put in a well, they can't pump a well
23   because of the contamination, there is a loss of use.
24          THE COURT:  Yes, that's true.  How do you measure the
25   economic value of that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

44

13UAMTBAps

```
 1                MR. AXLINE:  That is a matter for expert testimony.
 2                THE COURT:  OK.
 3                MR. AXLINE:  And it's true for both my bird example,
 4      which is I understand has not flown well with you, but which is
 5      nevertheless a recognized claim under the New Jersey Spill Act,
 6      and maybe we should brief this to give you some background on
 7      the nature of that claim, but nevertheless that is -- those are
 8      both a matter for expert testimony.  And there will be one
 9      expert who is going to testify on behalf of the state with
10      respect to all those damages, and defendants are going to have
11      every bit of information the state has --
12                THE COURT:  But try to bring it back into the realm of
13      law and the emotional realm, which I think is on the birds, but
14      on this realistic legal realm, you would not need discovery,
15      Mr. Riccardulli, from the homeowners, that's for sure.  If the
16      fact that there's a cluster of 290 private wells is almost as
17      relevant to the damages question, then I think it might be
18      relatively irrelevant to the alternative source argument,
19      because they are clustered.  So if there are, I don't know, a
20      hundred on the same block, the alternative source is either 200
21      yards away or not.  It would it would be either uphill or
22      downhill, however.
23                MR. RICCARDULLI:  I have something here that I think
24      will help.  In our 72, our letter, as Exhibit H, for example --
25                THE COURT:  This one?  In the book.  In the book.  I
```

13UAMTBAps
1    have it.
2              MR. RICCARDULLI:  You have that?
3              THE COURT:  Yes.
4              MR. RICCARDULLI:  This is the Getty Service Station
5    that plaintiffs have designated as a trial site.
6              THE COURT:  Right.
7              MR. RICCARDULLI:  The site there is, the station
8    itself is in the middle of that circle.  And coming from the
9    circle, there seemed to be, in -- it's either orange or peach
10   or a triangle that sort of comes away from the service station.
11   The yellow line represents, for 78, the plaintiffs have to
12   delineate the size of the site.  This is the area that they say
13   has been contaminated by the release from the service station.
14             THE COURT:  OK.
15             MR. RICCARDULLI:  Now, what's important is, not every
16   site -- now, this one does, but let's assume for a second,
17   because, for example, the Sunoco station -- and I don't have a
18   depiction of it for you.  So there's no potable wells, within
19   that circle.
20             THE COURT:  OK.
21             MR. RICCARDULLI:  There's no --
22             THE COURT:  And then there's no damage to that
23   resource.
24             MR. RICCARDULLI:  No, no, no.  There is still damage
25   to all the groundwater that's underneath the site.  Even
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13UAMTBAps

 1    though -- but they won't rely on evidence of the impact on the
 2    receptors as part of their damages model.  They're still going
 3    to have somebody come in and say, the groundwater in that
 4    circle has got, you know, a thousand parts per million in the
 5    middle, and as you go out to the edges here, it's going to be
 6    down to non-detected at some point.  But that doesn't mean --
 7    so for purposes of discovery and what was in front of you there
 8    on that exhibit, the other pinpoints there when they drew the
 9    circle around the one trial site, they captured five other
10    release sites that any one of us could have picked for purposes
11    of this case.  So those are the pins --
12              THE COURT:  I see three.
13              MR. RICCARDULLI:  Well, there's three in the middle
14    and there's one, two, three as you move to the --
15              THE COURT:  Oh, right.  I thought the three -- I
16    thought you were --
17              MR. RICCARDULLI:  No, there's -- so that yellow line
18    captures five release sites.  So at a minimum --
19              THE COURT:  Is each pin a release site?
20              MR. RICCARDULLI:  Yes.
21              THE COURT:  I see six.
22              MR. RICCARDULLI:  There's six.  There's the station
23    and then five more.
24              THE COURT:  Oh, OK.
25              MR. RICCARDULLI:  So at a minimum, now, if you're
                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

13UAMTBAps
```
 1   defending the Getty site at this trial, I'm going to have to
 2   say well, the MTBE that you're now complaining about and your
 3   expert is talking about came from those five other release
 4   sites and they're not my fault.
 5            Additionally, I have to establish what the nature or
 6   what the condition of the aquifer underneath that site was
 7   before the MTBE got there.
 8            THE COURT:  "That site" meaning the trial site.
 9            MR. RICCARDULLI:  Meaning the trial site.
10            THE COURT:  One site.
11            MR. RICCARDULLI:  Meaning this circle that they drew.
12   So if they're going to say that the size of this room, for
13   example, is the size of a plume, the groundwater that was
14   impacted, but I can show that there is so much PCE in this room
15   anyway, that was there before the MTBE, there's been no
16   incremental loss of use, because the water was unusable before
17   the MTBE got there.
18            THE COURT:  Right.
19            MR. RICCARDULLI:  So when you do this, and, for
20   example, on the Sunoco site, just as when you draw the circle,
21   with no receptors, no private wells, so we're just talking
22   groundwater, there are 11 other release sites in the circle
23   they drew around the Sunoco station, and if you talk about un--
24   non-MTBE sites, other contaminant sites based on New Jersey
25   database, there's 108 other contaminant sites in the circle
```

13UAMTBAps
 1   they drew.
 2            So that's why the case is so big.  It's not
 3   necessarily just, I'm going to reduce the receptors.  It's the
 4   circle they drew around the site is so large that they've made
 5   this -- look, it's their case.  If that's really the size of
 6   this site, so be it.  But I need to know, for example, here, if
 7   later -- and they've said they're still looking in on this --
 8   when the expert takes another cut, if they cut this circle, for
 9   example, in half and they eliminate the bottom half of that
10   circle, I need to know if I need to go looking for the sites in
11   that area.  Are they out of the case?
12            THE COURT:  So you're saying they should finalize the
13   circles by X date.
14            MR. RICCARDULLI:  Yes.  That's the first --
15            THE COURT:  It's that simple.  And now we're talking
16   only the 20 trial sites.
17            MR. RICCARDULLI:  20 trial sites.
18            THE COURT:  Well, Mr. Axline, that's right too.  Why
19   shouldn't there be a final cutoff date for this drawing of the
20   circles so that they know how many sites are within the circles
21   so they know what they have to discover?  It really can't be a
22   moving target where the circle either expands or shrinks, you
23   know, six months from now, 12 months from now, on the eve of
24   trial.  That's really not fair.  I mean, I guess they wouldn't
25   mind if it shrunk a lot, but maybe they would.  They really
                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

13UAMTBAps

```
 1   want it fixed, at a date certain.  Where are you up to in
 2   fixing that circle in 20 sites?  And I say just 20.  We managed
 3   to cut back to 20.
 4           MR. AXLINE:  Yes.
 5           THE COURT:  So for the 20 sites, what does it take you
 6   to finalize that circle?
 7           MR. AXLINE:  Your Honor, part of the dilemma is that
 8   we are being asked to do that prior to expert analysis.  So it
 9   will be --
10           THE COURT:  Not really.  You can do expert analysis
11   tomorrow.  There is a cutoff for expert reports.  There's a
12   cutoff for expert depositions.  But nobody is stopping you from
13   sitting down with your experts tomorrow saying the Court has
14   imposed a deadline of no more than 60 days from today, we have
15   to finalize our circle, Mr. Expert or Ms. Expert -- would if
16   there were many Ms. Experts -- but in any event we have to
17   finalize our circles by 60 days because the Judge said so and
18   she's going to make us stick to the circle that we draw on June
19   1.  So that's it, Ms. Expert.  I don't care when the report is
20   due.  And I don't care when your deposition is.  But draw the
21   circle that you're going to live with.
22           There's nothing about anybody asking you to do that
23   prematurely.  In fact it's late.  So how about I set that?  I
24   did say June 1.  I need to have -- I don't -- not me, but the
25   defense needs to have the final circle that you're going to
```

13UAMTBAps
 1  live with on 20 sites.
 2         MR. AXLINE:  We can live with that, your Honor.  But I
 3  do have a request, because the defendants themselves have their
 4  own information on each of these sites, particularly defendant
 5  who has done the -- who has had their --
 6         THE COURT:  It's not their case.  It's your case.  You
 7  draw the circle that you're going to live with.  All my other
 8  cases, of which there are now thousands over the years, they
 9  don't say to the defense, please give me all your information
10  so I can develop my theory of the case.  We don't do that.
11  It's your case.  Sit down with your experts, draw your circles,
12  and be done.
13         MR. AXLINE:  But you do ordinarily get to conduct
14  discovery against the defendants with respect to damages, your
15  Honor.
16         THE COURT:  Oh, with respect to damages, but we're not
17  entirely talking damages.  We're talking where you claim the
18  contamination caused by the release of the -- the site that you
19  selected essentially ends.
20         MR. AXLINE:  True.  That is a surrogate for damages in
21  this case because we're cutting off any ability to claim
22  damages outside of what that circle is.
23         THE COURT:  Well, you know, Mr. Axline, litigation
24  isn't perfect.  But we do our best.  It's a big case.  But you
25  don't want it to go on into the next century.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

13UAMTBAps

```
 1              MR. AXLINE:  Understood.  I'm not asking for
 2   perfection, your Honor.  I'm asking for fairness and
 3   cooperation.
 4              THE COURT:  60 days from now, June the 1st, your
 5   expert should finalize the circle.
 6              MR. AXLINE:  We will do that, your Honor.  But we
 7   would like the opportunity to conduct limited discovery against
 8   the defendants with respect to --
 9              THE COURT:  On what?
10              MR. AXLINE:  -- their information on groundwater flow
11   direction, subsurface pathology at the sites where the releases
12   have occurred, because they have developed that information.
13              THE COURT:  Who said they have developed it?  For
14   these 20 sites?
15              MR. WALSH:  Yes.  Some of our problem with figuring
16   out where groundwater flow direction comes from, our analysis
17   of the defendants' own consulting reports, those that have been
18   submitted to the state, that show groundwater flowing in
19   different directions at different times of the year.
20              THE COURT:  But you won't accept theirs anyway.  In
21   other words, at the end of the day, if your expert and their
22   expert disagree, you can argue to the jury your expert has the
23   right model, theirs is wrong.  So this is just an early peek at
24   the defense.  It's not helping you to draw the circle.  So I
25   frankly don't see the connection.  I'm sorry, Mr. Axline, but I
```

13UAMTBAps
1  see it they way I call it.  I saw it your way with respect to
2  depositions and schedules, but I don't agree here.  That's
3  their defense.  That's their theory.  You set the circle.
4          June 1 is the cutoff.  If it's not done by then, I
5  will preclude it.  That's the point.  Deadlines have to meet
6  something.  There has to be a consequence.  So you're going to
7  get that by June 1.  All right.
8          MR. RICCARDULLI:  Thank you, your Honor.
9          THE COURT:  All right.
10         Now, back to where we're up to.
11         And you, have said, Mr. Axline, that you're in the
12 process now of cutting back on some of the receptors?
13         MR. AXLINE:  While we're already engaged in this
14 process that we've just discussed, your Honor, you've given us
15 a June 1st deadline.
16         THE COURT:  It's the same.  We're trying to cut back.
17 That's all one and the same.
18         MR. AXLINE:  Yes.
19         THE COURT:  OK.  And we're going to start that effort
20 to get discovery from the water suppliers.  Right away.  Each
21 appoint a point person.  They're going to write this one
22 e-mail.  They're going to get started.  We're going to see if
23 we're going to continue this discussion.  All right.
24         So I think we're on our way toward finishing the New
25 Jersey part of this conference.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13UAMTBAps
```
 1            With respect to the proposed schedule, I don't have a
 2   general problem with the plaintiff's proposal, but what I like
 3   is the first three entries in the defendants' proposal.  You
 4   start out, Mr. Axline, in yours, with February 29, 2012, fact
 5   discovery ends.  They had some -- I didn't know.  That is the
 6   date.  I picked that.  I didn't realize you picked it.  So
 7   there it is.  We are thinking alike.  I didn't even look down,
 8   but anyway they proposed three dates in between.  I thought
 9   that was a good thing.  They said plaintiffs would confirm
10   and/or defer to delineate each trial site, and miraculously,
11   that's the same date I came up with.  And then they said
12   plaintiffs designate non-site-specific experts, defendants
13   designate non-site specific experts.  Those are a good idea.
14   Not the date but the concept of the more dates set, Mr. Axline,
15   the better.  So all I'm saying is, when you work one more time
16   to put together one joint TMO, I would just add whatever date
17   you agree on.  It doesn't have to be December 1 to December 15,
18   but whatever date makes sense.  And then pick up for yours when
19   fact discovery ends.  And etc.
20            MR. RICCARDULLI:  Your Honor, on the date for the
21   ultimate cutoff of fact discovery --
22            THE COURT:  Yes.  I was just going to look at that.
23   You mean the date they proposed, February 29?
24            MR. RICCARDULLI:  No, I was going to suggest that once
25   we get plaintiffs' June 1st submission on the new line, we'll
```

54

13UAMTBAps

```
 1   have to go back and then do the calculations again, similar to
 2   what we did in the exhibit that we looked at just a minute ago,
 3   and try to see if it reduces the number of sites that we need
 4   to look at.  That was our difficulty in trying to propose a
 5   true end date for fact discovery.  We would like to see --
 6              THE COURT:  I was going to say, they're proposing
 7   February 29, right?
 8              MR. RICCARDULLI:  I think that's it.
 9              THE COURT:  That's the first entry I'm looking at.  It
10   says fact discovery and a separate request for admissions
11   February 29.
12              MR. RICCARDULLI:  I guess my suggestion is, if we can
13   maybe hold off on setting a date for the close of fact
14   discovery.
15              THE COURT:  I think that's a bad idea.  I would rather
16   hear and decide an argument as to why it has to be enlarged.
17              MR. RICCARDULLI:  Under the circumstances Judge, just
18   until June.
19              THE COURT:  I know what you want.  Just until June is
20   two months away.  It's better to have it go.  I just talked
21   about 11 months to do all this discovery starting April 1ened
22   ending March 1.
23              MR. RICCARDULLI:  OK.  Well, just so you --
24              THE COURT:  I don't want to put it off till June.
25              MR. RICCARDULLI:  We'll look at it again.  The numbers
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

13UAMTBAps
```
 1   in June.  And then we may come back and -- because if they
 2   don't change, for example, we're stuck with potentially having
 3   it take discovery of -- and some of it is very limited, but
 4   others may not -- of about a thousand different MTBE sites and
 5   NJEMS, you know, other contaminant sites, for these sites.
 6   That's a lot of --
 7             THE COURT:  What did you say?
 8             MR. RICCARDULLI:  I'm sorry.  NJEMS, it's a database.
 9   It's NJEMS.
10             THE COURT:  Thank you.
11             MR. RICCARDULLI:  Which are other contaminant sites.
12   Right now the way these are drawn, the way we looked at it,
13   that's a thousand sites.
14             THE COURT:  It's not going to be a thousand sites.  No
15   way.  You also said you're really ignoring the concept of
16   clustering, which is just not fair.  I don't see why these
17   can't be clustered, particularly the private wells.
18             But putting this off for a minute, why don't we just
19   go around about here and since we're starting April 1, why
20   don't we close March 30.  So I'm just bumping yours up one
21   month, Mr. Axline, just for aesthetic.  We'll make it 11
22   months.  And hopefully that will be it.  So I suggest including
23   their first three categories, then jumping over to yours.  It
24   makes sense to me to try to really have a real schedule.  Except your
25   last point would be 21 days on the deposition notice.
```

56

13UAMTBAps
1    Otherwise yours looks good.  I'd like to get something in
2    place.  If you really can't work it out by compromise, then
3    again I would prefer just finalizing the dates.
4             So that, I think, does complete, after an hour and a
5    half of this, New Jersey.  And that leaves with us Puerto Rico.
6             In Puerto Rico, the parties are still in disagreement
7    as to the Puerto Rican Aqueduct and Sewer Authority.  They've
8    been arguing it's the commonwealth's.  Plaintiffs say it's not,
9    but they're agreeing to treat the Aqueduct and Sewer Authority
10   as a covered person.  And so the dispute again is over the
11   location of the receptor site.  Plaintiffs say they have
12   provided physical addresses for 769 of the 771 identified
13   wells, and they say they have produced GIS coordinates for 281
14   of the identified wells.  Well, defendants say that's only 30
15   percent of the wells.  But plaintiffs say, that's the only ones
16   for which we have GIS coordinates, and you can't order us to
17   produce coordinates we don't have.
18            So would -- Mr. Pardo?
19            MR. PARDO:  Yes, your Honor.
20            THE COURT:  Are you from Puerto Rico or New Jersey?
21   You're my hero.
22            MR. PARDO:  Having a good day.
23            Yes.  The issue is really, we need to know the
24   location of all the wells that the plaintiffs put at issue.
25            THE COURT:  Right.  And they gave you physical
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13UAMTBAps
1  addresses for 769 and 771.  That's just too short of perfect.
2  Two sites short of perfect.
3          MR. PARDO:  It is.  And if the addresses were usable,
4  it would be helpful.  But you need to understand we're not
5  talking about addresses like you and I are used to, 34 Madison,
6  500 Pearl.  What we've been given is a route number for a road
7  that may go for 50 miles, and then a -- what we think may be a
8  mile marker.  So, for example, this well can be found at mile
9  7, on Route 1 in this province of Puerto Rico.
10         Now, we went through this for some of the release
11 sites that were put at issue.  We were actually given similar
12 addresses and we sent some of our people out to try to find a
13 service station, which is much bigger than a well.  And when
14 they went where the address said to go, they found what you
15 would expect just standing in a middle of a town or a field and
16 you've got to go then look around for the service station.
17 It's not so hard to do if you're dealing with a service
18 station.  It's much harder to do if you're dealing with a well.
19         THE COURT:  Right.
20         MR. PARDO:  So you've seen some of these maps.  What
21 we want to do is we want to be able to put pins on maps.  And
22 you want do that with the addresses that we've been given.  I
23 can type into the GIS system --
24         THE COURT:  OK, Mr. Axline, what you can do to pin the
25 tack on the map?

13UAMTBAps

1          MR. AXLINE:  We can do what we are doing, which is
2    cooperating with the defendants, giving them access to PRASA,
3    so that PRASA can fill in the blanks, and if that means
4    actually going on the ground and pointing out the well, we're
5    going to encourage PRASA to do that.
6          THE COURT:  It doesn't have to encourage it.  Again, I
7    have a plaintiff here who wants to move its case forward.  If
8    it doesn't, it could be dismissed for failure to prosecute.  It
9    has to locate the wells.  It's its job.  It brought the
10   lawsuit.  It has to do it.  It's not a matter that we're so
11   good that we're willing to cooperate.  It's its obligation to
12   locate the sites of the wells.  So this PRASA, since we're now
13   calling it that, doesn't have anything to do with defendants.
14   PRASA needs to go out in its little truck now all over Puerto
15   Rico and get pins stuck in maps.  Period.  And it needs to do
16   that by June 1, the same 60 days.  Send the trucks out.
17         MR. AXLINE:  Your Honor, June 1 is tight for New
18   Jersey.  Can I consult with PRASA and see if that is possible
19   to do in that time period, and if not give you a time period
20   within which it is possible?  If it's possible we'll do it.
21   But I just know, dealing with Puerto Rico, that it's a little
22   more difficult than it sometimes appears.
23         THE COURT:  Right.  So why don't I just say July 1 and
24   tell them it's nonnegotiable.  The Court has ordered it.  They
25   have 90 days to get their people out.  What they need to do is

13UAMTBAps

1    send people out in trucks, with maps, stick the pin in the map
2    where the well is.  They need to do it.  It needs to be
3    produced to the defense.  If they don't have the single GIS
4    coordinate -- what does this stand for, anyway?
5                MR. PARDO:  Global Information -- Geographic
6    Information.
7                THE COURT:  Information what?
8                MR. AXLINE:  Information Service.  I think that's the
9    same thing that your nav system uses in your car.
10               THE COURT:  Yes.  If they don't have that, I guess we
11   have to send people out on the roads and fields.  They've got
12   to do it if they want to bring this lawsuit.  They hope to
13   recover damages.  They've got to be able to put a pin in a map.
14   And they have to do it by July 1.  Instead of asking them
15   what's possible, tell them that's what the Court ordered and
16   the Court is not moving this date.  And if they want to have a
17   case left at the end of it, they better do it by July 1.
18               In fact, putting it differently, any place there's not
19   a pin on a map is out of a case.  That's incentive.
20               MR. AXLINE:  Understood, your Honor.
21               THE COURT:  Now what, Mr. Pardo?
22               MR. PARDO:  Well, thank you, your Honor, for that
23   directive.  Is it possible to get the information on a rolling
24   basis as they get it?
25               THE COURT:  Why not?

13UAMTBAps

```
 1              MR. AXLINE:  Yes.
 2              THE COURT:  Any time they get it done, it would be
 3     nice if you turned it over.  No reason why not.  But I can't
 4     order you certain number by certain date because that defeats
 5     the purpose.  But you should encourage them to give you ten at
 6     a time, 20 at a time, whenever they get it done.  That would be
 7     a better way to produce it to the defense.
 8              MR. PARDO:  Thank you.
 9              I guess the last point -- and I just want to raise
10     it -- is, of course, this information is information that we
11     hope to use, or would hope to use at some point as part of our
12     site-selection process.  Now, we are prepared, I think, to make
13     selections without this information.  However, one of the
14     things we want to obviously avoid doing as defendants, if we
15     can possibly help it, is picking for ourselves sites that might
16     be literally on top of wells.  As we get information about
17     where some of these wells are located, we may find --
18              THE COURT:  But don't you have that information for
19     281?
20              MR. PARDO:  We have it for some, correct, your Honor.
21              THE COURT:  Oh, 281.
22              MR. PARDO:  But we're still blind as to 60 percent of
23     them.  So I may pick a site --
24              THE COURT:  Well, not entirely blind.  You explain
25     what you do have.  Not the site now.  But it's not blind.  But
```

13UAMTBAps
1    go ahead.
2               MR. PARDO:  To a point.  I can get it to an area.
3               THE COURT:  Yes.
4               MR. PARDO:  We do have our second round of selections
5    due for discovery sites in the next couple weeks.  And we're
6    not asking that that date be changed.  We will take what
7    information we have, and we have very little.  We're not just
8    missing location information, we're missing testing data of
9    these wells and other things.  But if we get to a position
10   after we receive this information, which we, by the way, have
11   been asking for for about a year, and we find that in fact we
12   have picked a site that we probably wouldn't have picked had we
13   had this information, we may want to come back and have a
14   conversation with the Court about substituting a site in or
15   out.
16              THE COURT:  That won't be a shock.  It won't be the
17   first time.  Basically what you want me to say is, I lift the
18   ten-day limit on a motion to reconsider.  If I need to
19   reconsider the site selection, there won't be a time limit.
20   But there will be a cutoff.  In other words, if you get this
21   information by July 1, I would want to have any requests for
22   substitutions to take place no later than September 1.
23   Something like that?
24              MR. PARDO:  That would be very --
25              THE COURT:  Fair?  OK.
                     SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

13UAMTBAps

1               MR. PARDO:  Thank you, your Honor.
2               THE COURT:  OK.  Anything further for today?
3               MR. CORRELL:  Your Honor can I just raise one matter.
4               THE COURT:  Name again?
5               MR. CORRELL:  Charles Correll for Chevron.
6               When you came in, you commented about how many of us
7       are here.
8               THE COURT:  I did.
9               MR. CORRELL:  Part of what happens is, these
10      conferences get noticed in all cases, and so if we --
11              THE COURT:  You didn't know what the agenda was?
12              MR. CORRELL:  But this is what I wanted to clarify.
13      If, you know, Mr. Axline comes up and at the end of the
14      conference says I have a Sandoval issue --
15              THE COURT:  You want to be here.
16              MR. CORRELL:  -- I want to be here.  But it's not on
17      the agenda.  And so is what you're going to address in these
18      conferences limited to what's on the agenda, or if it's an
19      all-status conference --
20              THE COURT:  I usually expect it to be limited to the
21      agenda.  I mean, it hasn't been a total shock if sometimes
22      somebody says something exactly like that because, oh, by the
23      way in Orange County we're proceeding nicely, or we have one
24      problem, and somebody sometimes does sort of add in a business,
25      but pretty rarely.  We pretty well stick to the agenda.  This

13UAMTBAps
1   was all I was prepared to discuss today.
2           But the different point you make, Mr. Correll, which
3   is a good point, I was looking in a list of the number of
4   outstanding cases in the MDL.  I think it's still around 60.  I
5   was thinking about having a real status call and finding out
6   what is going on in every one of those 60.  We long ago lifted
7   any restriction on going forward in all cases.  I'd sure like
8   to know if all these cases are moving anywhere or some of them
9   should be dismissed.  So we've got charts.  I've only been here
10  since the beginning.  We went over the charts.  We tried to see
11  if Mr. Walsh -- even though the two had made an effort to pare
12  down and see how many were live.  I think it's something in the
13  range -- no, it's 48.  I just saw another date from my clerk.
14  It's 48.  I have 48 live cases in the MDL.  I don't know
15  whether all 48 are really doing anything or some of them are
16  just sitting around.  I do know that the number is 48.
17          MR. RICCARDULLI:  Your Honor, and we can work on our
18  end to try to --
19          THE COURT:  I can give you the 48.
20          MR. RICCARDULLI:  But if you can give us the number,
21  we'll confirm, and we'll get you a chart and work with
22  Mr. Walsh.
23          THE COURT:  OK.  Who is the point person for that?
24  Mr. Walsh?
25          MR. WALSH:  Yes, your Honor.

64

13UAMTBAps

```
 1              THE COURT:  Fine.  The reason I know is we had a
 2    report of cases over three years old.  There were 48 MTBE cases
 3    on our docket.  There were 48 that were more than three years
 4    old.  There may be more recent ones in addition since there
 5    were some recently filed, but there are 48 that are more than
 6    three years old.
 7              MR. PARDO:  I have an internal list of my own that I
 8    think has 20 on it.
 9              THE COURT:  We may be overreporting.  We just reported
10    48 today.  Maybe I'll cut off the report.  So we'll report it,
11    as of March 30, there were 48 cases.  Plaintiff, really, I can
12    get to you before you get back to your office.  You'll have it
13    by e-mail PDF.
14              MR. PARDO:  That would be great.
15              THE COURT:  Thank you.
16              So, Mr. Correll, I don't know if that answers your
17    question, but my practice is to stick to the agenda.  And the
18    liaison lawyers know that one of the purposes of the agenda is
19    to let me know what's up for today's conference.
20              MR. CORRELL:  Thank you, your Honor.
21              THE COURT:  Thank you.  Anything further?
22              Thank you.
23              MR. WALSH:  Thank you, your Honor.
24              MR. PARDO:  Thank you, your Honor.
25                             o0o
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300